## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KORD L. TUCKER,

     Petitioner,

v.                                                    Case No. 8:22-cv-787-WFJ-AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## **ORDER**

Kord L. Tucker, a Florida prisoner, initiated this action by filing a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 12). Mr. Tucker filed a reply. (Doc. 29). After careful review, the petition is **DENIED**.

## I.    Background

This case arises from the murder of Michael Merrill, a 57-year-old commercial fisherman in Madeira Beach, Florida. (Doc. 12-2, Ex. 3, at 358, 431-32). The culprits were three other fishermen—Mr. Tucker, Timothy Schuyler, and Joshua Shroyer. (*Id.* at 530-32). In September 2012, the victim and Mr. Schuyler lived on a commercial fishing boat owned by Lucian Zaleski. (*Id.* at 435-37). Mr. Schuyler and the victim sometimes engaged in "drunken banter." (*Id.* at 446). On one occasion, Mr. Schuyler told Mr. Zaleski that the victim "was going to get his ass kicked" because "he's pissing me off." (*Id.*)

On the evening of September 11, 2012, Mr. Tucker, Mr. Schuyler, and Mr. Shroyer were drinking at a bar in Madeira Beach. (*Id.* at 532-33). Mr. Schuyler complained that the victim had swung "a knife at him earlier that day." (*Id.* at 534). Mr. Tucker had called 911 to report the incident, although he told the operator it was "not an emergency" and "left before [the police] showed up." (*Id.* at 495). Mr. Tucker and Mr. Schuyler now "said they were going to . . . beat [the victim's] ass." (*Id.* at 534-35). The two asked Mr. Shroyer— who stood 6'9" and weighed 280 pounds—to "back them up." (*Id.* at 530, 535). At the time, Mr. Tucker was 39 years old, Mr. Schuyler was 31, and Mr. Shroyer was 38. (*Id.* at 478, 481, 530).

Around 1:00 a.m., the three biked to Mr. Zaleski's boat to "kick [the victim's] ass." (*Id.* at 535-36). When he got off his bicycle, Mr. Tucker was "[p]syched up," "running toward the dock" and "yelling." (*Id.* at 536). He kicked the boat approximately ten times and said, "Wake up, motherf*cker." (*Id.* at 537). Mr. Shroyer entered the wheelhouse alone and found the victim crouching "in the corner" with "a knife in his hand." (*Id.* at 539-40). The victim "went at" Mr. Shroyer with the knife, and Mr. Shroyer "grabbed . . . his hand." (*Id.* at 546-47). During the struggle, Mr. Tucker and Mr. Schuyler entered the wheelhouse and began to kick the victim. (*Id.* at 548-50). Mr. Tucker kicked him in the ribs five or ten times; Mr. Schuyler kicked him several times "by the leg area." (*Id.* at 549-50). The victim was never "able to slash at anyone with the knife," and Mr. Shroyer was in "total control" of the "hand with the knife." (*Id.* at 551). The victim eventually let go of the weapon, and Mr. Shroyer kicked it away. (*Id.*)

After a short pause in the beating, the victim got up and tried to use his cell phone. (*Id.* at 552). Mr. Shroyer grabbed the victim's leg, and he dropped the phone. (*Id.* at 553-54). Mr. Tucker resumed kicking the victim, who lost control of his bowels. (*Id.* at 554). As he kicked the victim, Mr. Tucker said, "Why you crapping on yourself, motherf*cker?" (*Id.* at 554-55). Mr. Tucker then grabbed a "shop vac" and "slammed it on top of [the victim's] head about ten times." (*Id.* at 555). He also punched the victim in the face five or ten times. (*Id.* at 556). Then Mr. Tucker, Mr. Shroyer, and Mr. Schuyler got off the boat. (*Id.* at 557). The victim exited the wheelhouse, "jumped in the water," and swam away. (*Id.* at 557-59). The three culprits left the scene. (*Id.* at 560).

Shortly before 4:00 a.m., a man and his girlfriend called 911 to request medical assistance for the victim, who was on the "covered docks" in Madeira Beach. (*Id.* at 618-19). The victim told the bystanders that he had been "beat[en] up by a couple people." (*Id.* at 619). He was taken to the hospital in an ambulance. (*Id.* at 390). According to the paramedic, his "vital signs" were "within normal limits," but he "was obviously in a lot of pain." (*Id.* at 388).

At the hospital, medical staff determined that the victim had seven left rib fractures, a lacerated spleen, a collapsed left lung, and several lacerations to his face. (*Id.* at 667-68, 695-97). He was also a "chronic alcoholic" who suffered from "liver disease." (*Id.* at 669). The injuries he sustained during the beating "precipitated him to go into liver failure," which then caused "kidney failure." (*Id.*) The victim ultimately died on October 3, 2012—three weeks after the beating. (*Id.*) The surgeon who treated him explained that he "wouldn't have died" "had he not been injured" on September 12. (*Id.* at 670). Likewise,

3

the medical examiner concluded that the victim "died as a result of complications of blunt trauma." (*Id.* at 700).

Law enforcement interviewed Mr. Tucker two days after the beating. (*Id.* at 470-71, 480-81). After waiving his *Miranda*[1] rights, Mr. Tucker admitted that he had punched and elbowed the victim and "possibly hit him with a crescent wrench." (*Id.* at 483). He claimed, however, that he acted in self-defense, explaining that the victim "provoked" the fight by "pull[ing] [a] knife" and that he "[d]idn't go down there to beat him up." (*Id.* at 498, 505, 517). Mr. Tucker also said that he was "scared" of the victim because he "had tried to kill him" during an earlier incident on a different fishing boat. (*Id.* at 506).

Mr. Tucker, Mr. Schuyler, and Mr. Shroyer were ultimately charged with second-degree murder. (*Id.*, Ex. 2). Mr. Shroyer—who was facing a mandatory life sentence as a prison releasee reoffender—agreed to plead guilty and testify for the prosecution in exchange for a 20-year sentence. (*Id.*, Ex. 3, at 567-68). Mr. Tucker and Mr. Schuyler were tried together. In addition to the testimony described above, the jury heard from a jailhouse informant who had shared a cell with Mr. Schuyler. (*Id.* at 633-34). According to the informant, Mr. Schuyler "wanted [the victim] off the boat." (*Id.* at 637). Mr. Schuyler said that he "beat[] holes on the side of the boat" and hit the victim with a "socket wrench," causing him to "sh*t on himself." (*Id.* at 638, 640). The informant claimed that Mr. Schuyler "laughed about it"; he said he "he had literally kicked the sh*t out of him." (*Id.* at 640, 642).

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Mr. Tucker and Mr. Schuyler were found guilty as charged. (*Id.* at 1008-09). Mr. Tucker was sentenced to 35 years in prison. (*Id.*, Ex. 15). Following an unsuccessful direct appeal, Mr. Tucker moved for postconviction relief under Florida Rule of Criminal Procedure 3.850 and Florida Rule of Appellate Procedure 9.141(d). (*Id.*, Exs. 19, 22, 24). The state courts rejected each of his claims. (*Id.*, Exs. 23, 25, 28). This federal habeas petition followed. (Doc. 1).

## II.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves

an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The appellate court in Mr. Tucker's case affirmed his conviction, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

## B.    Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C.    Ineffective Assistance of Counsel

Mr. Tucker alleges ineffective assistance of counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Tucker must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Tucker must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA

deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III.   Discussion

### A.   Ground One—Limitation of Causation Defense

Mr. Tucker argues that the trial court violated his constitutional rights by limiting his ability to present a "causation" defense to second-degree murder. (Doc. 1 at 12). On the first day of trial, the prosecution moved to bar Mr. Tucker from arguing that the victim "wouldn't have died" "but for his medical conditions." (Doc. 12-2, Ex. 3, at 282). The prosecution relied on the "well settled" doctrine that "a criminal takes his victim as he finds him and cannot be excused from guilt and punishment because his victim was weak and could not survive the torture he administered." *Brate v. State*, 469 So. 2d 790, 793 n.2 (Fla. 2d DCA 1985). The court granted the motion, ruling that Mr. Tucker could not present a defense "along the lines of the [victim] wouldn't have died but for his weak physical condition." (Doc. 12-2, Ex. 3, at 283). According to the court, this argument was permissible only if "medical testimony" established that the victim's "medical condition" was "the sole cause of his death." (*Id.* at 279-80). No such testimony was presented at trial. Instead, the evidence showed that, although his medical conditions contributed to his death, the victim "wouldn't have died" "had he not been injured" during the beating. (*Id.* at 670).

Mr. Tucker contends that the court's ruling prevented him from "fully presenting evidence and argument to support [his] theory that the true cause of death . . . was [the victim's] own deteriorating medical condition and not the altercation that took place on the boat." (Doc. 1 at 12). He raised this argument on direct appeal, and the appellate court rejected it in an unexplained decision. (Doc. 12-2, Ex. 16, at 12-16; Doc. 12-2, Ex. 19). This Court thus "presume[s] that the unexplained decision adopted the same reasoning" as the trial court's ruling. *Wilson*, 584 U.S. at 125. That ruling was neither "contrary to" nor "an unreasonable application" of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus, Mr. Tucker is not entitled to relief.

"'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). The Supreme Court has repeatedly cautioned lower courts against framing its decisions at "a high level of generality." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013); *see also Brown v. Davenport*, 596 U.S. 118, 136 (2022) (noting that "holdings that speak only at a high level of generality" "cannot supply a ground for relief" under AEDPA). Accordingly, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles*, 556 U.S. at 122; *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision

10

of a state court about that unsettled issue was an unreasonable application of clearly
established federal law.").

The Supreme Court has never set any constitutional limits on "the common-law rule
. . . that a defendant must take his victim as he finds him." *United States v. Long Feather*,
299 F.3d 915, 917 (8th Cir. 2002). Known as the "eggshell skull doctrine," this rule
provides that "a victim's pre-existing condition does not relieve a perpetrator from the
consequences of his or her actions if those actions caused or hastened death." *Id.* Put
differently, "a murderer does not avoid conviction by pointing out that his act was only one
of many causes that concurred to bring about his victim's death." *Brackett v. Peters*, 11
F.3d 78, 80 (7th Cir. 1993). This doctrine is "well settled in Florida." *Brate*, 469 So. 2d at
793 n.2. Because the Supreme Court has never held that the constitution bars a state from
adopting the eggshell skull doctrine in criminal cases, Mr. Tucker cannot prevail on federal
habeas review. *See Loggins v. Thomas*, 654 F.3d 1204, 1222 (11th Cir. 2011) ("Because
implications are not actual holdings, the implications of Supreme Court decisions cannot
clearly establish federal law for § 2254(d)(1) purposes any more than dicta can.").

The trial court correctly applied this well-established doctrine, barring Mr. Tucker
from arguing that the victim "wouldn't have died but for his weak physical condition."
(Doc. 12-2, Ex. 3, at 283). In effect, Mr. Tucker sought to disclaim criminal responsibility
because "the victim's [medical conditions] may have made him more susceptible to death
from" the beating he received. *Weir v. State*, 777 So. 2d 1073, 1076 (Fla. 4th DCA 2001).
But "even if that were true, [Mr. Tucker] would not be excused from legal responsibility
as it is well-settled that he takes his victim as he finds him." *Id.* To be sure, the victim's

11

pre-existing conditions played a role in his demise. Still, the medical evidence established that he "wouldn't have died" on October 3 "had he not been injured" on September 12. (Doc. 12-2, Ex. 3, at 670). In other words, Mr. Tucker's acts "made [the victim's] death more likely and [], but for the assault, [he] would not have died as soon as [he] did." *Brackett*, 11 F.3d at 80. Thus, Mr. Tucker was "criminally responsible for the [victim's] death . . . notwithstanding" his pre-existing conditions. *Long Feather*, 299 F.3d at 917. The court did not violate clearly established law by applying this well-settled rule to Mr. Tucker.

## B.     Ground Two—Sufficiency of the Evidence

Mr. Tucker contends that the trial court violated his constitutional rights by denying his motion for judgment of acquittal. (Doc. 1 at 16-18). According to him, the prosecution failed to establish that he displayed "the ill will or evil intent necessary for a second-degree murder conviction." (*Id.* at 17). The trial court rejected this argument, and the appellate court affirmed in an unexplained decision. (Doc. 12-2, Ex. 3, at 715-28; Doc. 12-2, Ex. 19).

Mr. Tucker's sufficiency challenge is meritless. Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a challenge to the sufficiency of the evidence must evaluate whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Under *Jackson*, the prosecution does not have "an affirmative duty to rule out every hypothesis

except that of guilt beyond a reasonable doubt." *Id.* at 326. If the record contains facts

supporting conflicting inferences, the jury is presumed to have "resolved any such conflicts

in favor of the prosecution." *Id.*

Consistent with AEDPA, "a federal court may not overturn a state court decision

rejecting a sufficiency of the evidence challenge simply because the federal court disagrees

with the state court. The federal court instead may do so only if the state court decision was

'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v.

Lett*, 559 U.S. 766, 773 (2010)).

Mr. Tucker fails to show that the rejection of his sufficiency challenge was

"objectively unreasonable." *Id.* As noted above, he was charged with second-degree

murder. That offense is defined as "[t]he unlawful killing of a human being, when

perpetrated by any act imminently dangerous to another and evincing a depraved mind

regardless of human life, although without any premeditated design to effect the death of

any particular individual." Fla. Stat. § 782.04(2). "[A]n act is imminently dangerous to

another and evinces a 'depraved mind' if it is an act or series of acts that: (1) a person of

ordinary judgment would know is reasonably certain to kill or do serious bodily injury to

another; and (2) is done from ill will, hatred, spite[,] or an evil intent; and (3) is of such a

nature that the act itself indicates an indifference to human life." *Antoine v. State*, 138 So.

3d 1064, 1073 (Fla. 4th DCA 2014). "The requisite intent must generally be inferred from

the circumstances and may be demonstrated by the defendant's conduct before and after

his use of deadly force." *Finch v. State*, 299 So. 3d 579, 580 (Fla. 1st DCA 2020).

The prosecution presented sufficient evidence that Mr. Tucker "acted with a depraved mind." *Perez v. State*, 187 So. 3d 1279, 1282 (Fla. 1st DCA 2016). During the incident, Mr. Tucker repeatedly kicked the 57-year-old victim in the ribs, using enough force that he lost control of his bowels. (Doc. 12-2, Ex. 3, at 549-50, 554). Mr. Tucker continued to kick the victim even after he was disarmed. (*Id.* at 554). Then Mr. Tucker grabbed a "shop vac" and "slammed it on top of [the victim's] head about ten times." (*Id.* at 555). Next, he punched the victim in the face five or ten times. (*Id.* at 556). A "person of ordinary judgment would know" that these acts were "reasonably certain to" inflict "serious bodily injury"; they also "indicate[d] an indifference to human life." *Antoine*, 138 So. 3d at 1073.

Likewise, the prosecution proved that Mr. Tucker acted with "ill will, hatred, spite[,] or an evil intent." *Id.* When he arrived at the boat, Mr. Tucker was "[p]syched up," "running" on the dock and "yelling." (Doc. 12-2, Ex. 3, at 536). He kicked the boat approximately ten times and said, "Wake up, motherf*cker." (*Id.* at 537). During the beating, Mr. Tucker taunted the victim, saying, "Why you crapping on yourself, motherf*cker?" (*Id.* at 554-55). A reasonable jury could infer "ill will" from these facts. *See Peoples v. State*, 251 So. 3d 291, 303 (Fla. 1st DCA 2018) (jury could "reasonably infer enmity" from "the nature of the act which resulted in the victim's death"); *Antoine*, 138 So. 3d at 1074 (finding sufficient evidence of "depraved mind" where defendant "taunted" victim). Thus, the state court reasonably rejected Mr. Tucker's sufficiency challenge.

14

### C.    Ground Three—Failure to Raise Severance Issue on Direct Appeal

Mr. Tucker faults appellate counsel for failing to argue that "it was fundamental error for [him] to be tried at a joint trial with" Mr. Schuyler, his co-defendant. (Doc. 1 at 19). He contends that the trial should have been severed because the jury heard Mr. Schuyler's confession through the jailhouse informant, and the confession allegedly "spilled over onto" Mr. Tucker. (*Id.* at 20). The appellate court rejected Mr. Tucker's ineffective-assistance claim in an unelaborated order. (Doc. 12-2, Ex. 23).

This claim lacks merit. Before the trial court, Mr. Tucker did not object to being tried jointly with Mr. Schuyler. Nor did he move for severance. Thus, the claim for ineffective assistance of appellate counsel turns on whether the alleged error was "fundamental" under Florida law. If the alleged error was "not fundamental, then [Mr. Tucker's] appellate counsel would have been procedurally barred from raising it on appeal, and so he could not have been ineffective for failing to raise it." *Scott v. Sec'y, Dep't of Corr.*, 857 F. App'x 548, 551 (11th Cir. 2021); *see also Murphy v. State*, 495 So. 2d 1237, 1238 (Fla. 4th DCA 1986) (requiring showing of "fundamental error" where "motion for severance was not timely made").

By rejecting Mr. Tucker's ineffective-assistance claim in an unelaborated order, the appellate court "implicitly" determined that the joint trial was not fundamentally erroneous. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) (holding that, "[b]ecause the Florida Second District Court of Appeal denied [petitioner's] state habeas petition" without explanation, "the Florida court has already determined, albeit implicitly, that the error was not fundamental error"). "[T]he fundamental error question is an issue of state

law, and state law is what the state courts say it is." *Id.* at 1299. Therefore, this Court "must defer to the [state] court's underlying determination[]" that the joint trial was not fundamentally erroneous. *Id.* at 1297-98. Because the failure to sever the trial did not constitute fundamental error, "appellate counsel would have been procedurally barred from [raising the issue] on appeal." *Scott*, 857 F. App'x at 551. Counsel "will not be held to have performed deficiently" where, as here, he "fail[s] to perform a futile act, one that would not have gotten his client any relief." *Pinkney*, 876 F.3d at 1297.

## D.    Ground Four—Failure to Seek Severance in Trial Court

Relatedly, Mr. Tucker contends that trial counsel should have moved to sever his trial from Mr. Schuyler's. (Doc. 1 at 24). As noted above, severance was allegedly necessary because Mr. Schuyler's confession—as recounted to the jailhouse informant— "crossed over onto" Mr. Tucker. (*Id.* at 25). Mr. Tucker argues that, had the trial been severed, there is a "reasonable probability" that "the result of the proceedings would have been different." (*Id.* at 26-27).

Before the informant testified, the prosecution noted on the record that it would "explain the *Bruton* rule"[2] to him. (Doc. 12-2, Ex. 3, at 614). "In *Bruton*, the Supreme Court held that the admission of a statement made by a non-testifying defendant which inculpates a co-defendant violates the co-defendant's right to confront a witness." *United States v. Veltmann*, 6 F.3d 1483, 1500 (11th Cir. 1993). Mr. Schuyler did not testify at trial, so his confession needed to comply with *Bruton*. It is well established, however, that "the

---

[2] *Bruton v. United States*, 391 U.S. 123 (1968).

admission of a non-testifying co-defendant's confession does not violate *Bruton* if the confession is redacted to eliminate all reference to the other co-defendant's name and existence." *United States v. Vasquez*, 874 F.2d 1515, 1518 (11th Cir. 1989).

In accordance with these principles, the informant did not refer to Mr. Tucker when recounting Mr. Schuyler's confession. Instead, he testified that Mr. Schuyler (1) "beat[] holes on the side of the boat," (2) hit the victim with a "socket wrench," causing him to "sh*t on himself," and (3) "laughed about it" at the county jail. (Doc. 12-2, Ex. 3, at 638, 640, 642). Mr. Tucker contends, however, that the following passage indirectly implicated him in the beating: "Well, when [Mr. Schuyler] said—he said after he did, at one point, that *they* were—*they* was laughing or he was laughing that—because *they*—that he squirt— at some point in time that he, the victim, was squirted in the butt with the hose and that the place smelled like sh*t." (*Id.* at 642 (emphasis added)). Mr. Tucker maintains that, had counsel successfully moved for severance, the jury would not have heard this testimony, which allegedly "crossed over onto" him. (Doc. 1 at 25).

The postconviction court rejected this claim, holding that Mr. Tucker was not "prejudiced by the introduction of [the informant's] testimony." (Doc. 12-2, Ex. 25, at 4). The court explained that the informant "did not make any reference to [Mr. Tucker] or [Mr. Tucker's] actions and only reported what [Mr.] Schuyler allegedly told him about [Mr.] Schuyler's own involvement in the incident." (*Id.*) Specifically, the informant stated that Mr. Schuyler "did not want the victim on the boat anymore because the victim had run out of money, that [Mr.] Schuyler hit the victim with a socket wrench and later threw large sockets at him after he jumped overboard, and that [Mr.] Schuyler was laughing that he

'literally kicked the sh\*t' out of the victim." (*Id.*) "Although the co-defendants were alleged to have acted in concert, [the informant] only described [Mr.] Schuyler as having an intent to harm the victim and taking action that would have caused the victim's injuries." (*Id.*)

The postconviction court reasonably found no prejudice. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Tucker]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. Tucker cannot meet this demanding standard. As the postconviction court explained, Mr. Schuyler's confession—as relayed by the informant—did not refer to Mr. Tucker. Instead, it recounted Mr. Schuyler's "own involvement in the incident," and it "only described [Mr. Schuyler] as having an intent to harm the victim and taking action that would have caused the victim's injuries." (Doc. 12-2, Ex. 25, at 4). To be sure, the informant inadvertently stated that "they" laughed when the victim lost control of his bowels. (*Id.*, Ex. 3, at 642). But the informant never said who "they" were, and the pronoun

could have referred only to Mr. Schuyler and Mr. Shroyer. In any event, the prosecution did not argue that this stray remark established Mr. Tucker's involvement in the beating. Moreover, the jury was instructed to "consider each defendant and the evidence applicable to him separately." (*Id.* at 1001). Finally, even apart from Mr. Schuyler's confession, the jury heard ample evidence of Mr. Tucker's guilt, including the testimony of his other co-defendant, Mr. Shroyer. In these circumstances, a fairminded jurist could conclude that, even if the trial had been severed and the jury had not heard Mr. Schuyler's confession, there was no "reasonable probability" that "the outcome at trial would have been different." *Reed*, 767 F.3d at 1261; *see also United States v. Lumpkin*, 44 F. App'x 246, 247 (9th Cir. 2002) ("[R]egardless of whether or not the evidence of the co-defendant's confession may have violated *Bruton,* taking into consideration the rest of the evidence against [defendant], it is not reasonably probable that the outcome of the trial would have been different, and there was no prejudice.").

Separately, Mr. Tucker alleges that counsel should have sought severance because Mr. Schuyler was "ready, willing, and available to testify" at Mr. Tucker's "solo trial," but was "not willing to testify at [the] joint trial due to his record of past [felony] convictions." (Doc. 1 at 25). Mr. Schuyler allegedly would have testified that Mr. Tucker "ceased all actions against the alleged victim the moment the victim was disarmed." (Doc. 12-2, Ex. 24, at 27). "To obtain a severed trial based on a defendant's desire to offer a co-defendant's potentially exculpatory testimony, the defendant must show: (1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature and effect, and (4)

that the co-defendant will in fact testify if the cases are severed." *Daniels v. State*, 634 So. 2d 187, 192 (Fla. 3d DCA 1994).

Here, Mr. Tucker simply asserts that Mr. Schuyler would have testified if the trial had been severed. But "[a] defendant is not entitled to severance on the weight of an unsupported possibility that a co-defendant's testimony might be forthcoming at a separate trial." *United States v. Graham*, 548 F.2d 1302, 1311 (8th Cir. 1977). And "[w]ithout an affidavit from [Mr. Schuyler] or similar proof," Mr. Tucker "cannot establish that [Mr. Schuyler] would have testified if his trial had been severed from [Mr. Tucker's] trial." *United States v. Owens*, 683 F.3d 93, 99 (5th Cir. 2012); *see also United States v. Duzac*, 622 F.2d 911, 912 (5th Cir. 1980) (trial court properly denied motion to sever where defendant alleged only that co-defendant "might have elected to testify" at separate trial). Because Mr. Tucker fails to show that severance would have been granted on this basis, counsel was not deficient for failing to file a motion to sever.[3] *See United States v. Giangrosso*, 779 F.2d 376, 379 (7th Cir. 1985) ("The speculative possibility that a co-defendant may testify for another defendant, if the trial is severed, is insufficient to establish the requisite prejudice justifying severance.").

---

[3] To the extent that Mr. Tucker argues severance was necessary because he and Mr. Schuyler presented conflicting defenses, the postconviction court correctly rejected this argument. As the court explained, both Mr. Tucker and Mr. Schuyler "utilized a strategy of self-defense at trial." (Doc. 12-2, Ex. 25, at 4). Therefore, "their defenses were consistent," and severance was not warranted on this basis. (*Id.* at 5).

### E.    Ground Five—Failure to Argue Self-Defense

Mr. Tucker faults trial counsel for failing to "raise a defense of self-defense." (Doc.
1 at 28). According to Mr. Tucker, he and Mr. Schuyler "only restrained the victim to assist
[Mr.] Shroyer in his attempt to disarm the victim." (*Id.* at 29).

The postconviction court correctly rejected this claim because counsel "did employ
a strategy of self-defense." (Doc. 12-2, Ex. 25, at 5). As the court explained, the parties
"discussed the instruction on justifiable use of deadly and nondeadly force at the jury
charge conference," the jury was "instructed . . . on self-defense," and counsel "argued
self-defense to the jury." (*Id.*) Specifically, counsel urged the jury to acquit Mr. Tucker
because "[e]ach one of [the defendants] saw [the victim's] knife," and "[e]ach one of them
believed that there was a danger at that point in time and each one of them tried to subdue
[the victim]." (*Id.*, Ex. 3, at 908). Counsel elaborated that Mr. Tucker "ha[d] every right to
prevent [the victim] from cutting Mr. Shroyer, to use force, and that's what happened." (*Id.*
at 923). As the court pointed out, some "facts in evidence . . . supported [this] defense,"
including the testimony about Mr. Shroyer's struggle with the victim over the knife. (*Id.*,
Ex. 25, at 5).

In short, "counsel elicited the facts that would form the basis of a self-defense claim,
requested the instructions, and argued that [Mr. Tucker] acted in self-defense." (*Id.* at 6).
The jury rejected this argument, but "[t]he fact that a particular defense was unsuccessful
does not prove ineffective assistance of counsel." *Ward v. Hall*, 592 F.3d 1144, 1164 (11th
Cir. 2010). Thus, Mr. Tucker "cannot demonstrate deficient performance when counsel did
what [he] wanted [her] to do." *Owens v. Sec'y, Dep't of Corr.*, No. 5:14-cv-266-RH-GRJ,

2017 WL 9440396, at *8 (N.D. Fla. Apr. 18, 2017), *adopted by* 2017 WL 2861651 (N.D. Fla. July 5, 2017). The court properly concluded that the "record conclusively refute[d] this claim." (Doc. 12-2, Ex. 25, at 5).

### F.    Ground Six—Failure to Adequately Impeach Witnesses

Mr. Tucker faults trial counsel for failing to adequately impeach the prosecution's "most critical witnesses"—Mr. Shroyer and the jailhouse informant. (Doc. 1 at 32). The Court addresses each witness in turn.

### 1.    Mr. Shroyer

First, Mr. Tucker alleges that counsel should have highlighted that Mr. Shroyer offered two different "versions" of what happened on the boat. (*Id.* at 33). In one version, Mr. Tucker and Mr. Schuyler "immediately ceased" the attack when Mr. Shroyer "wrestled the knife away from the victim." (*Id.* at 33). Mr. Shroyer allegedly presented this version at trial. (*Id.*) In the other version, Mr. Shroyer testified that Mr. Tucker and Mr. Schuyler "continued to assault the victim even after [Mr.] Shroyer removed the knife." (*Id.*) Mr. Shroyer allegedly presented this version both at trial and at his deposition. (*Id.* at 33-34).

This argument rests on a mischaracterization of the record. As the postconviction court explained, Mr. Shroyer did not offer "two separate versions" of the incident. (Doc. 12-2, Ex. 25, at 8). Instead, he described "one continuous event." (*Id.*) Mr. Tucker contends that the exculpatory version came out during Mr. Shroyer's direct examination at trial. (Doc. 1 at 33). In this portion of his testimony, Mr. Shroyer stated that Mr. Tucker and Mr. Schuyler "stopped for a minute" after the victim was disarmed. (Doc. 12-2, Ex. 3, at 551-52). But Mr. Shroyer did not say the attack was over at that point. He testified that after a

brief pause, the victim tried to place a call on his cell phone, the phone fell out of his hand, and Mr. Tucker "started kicking on him some more," causing him to "crap[] himself." (*Id.* at 552-54). Thus, as the court explained, "what [Mr. Tucker] refer[red] to as [Mr.] Shroyer's 'second version' of events, in which [Mr. Tucker] resumed assaulting the victim, [was] simply a continuation of the events from the 'first version,' in which [Mr. Tucker] stopped assaulting the victim." (*Id.*, Ex. 25, at 8). Because "there were no contradictions" in the testimony, counsel "was not deficient" for failing to make this argument. (*Id.*)

Second, Mr. Tucker faults counsel for not bringing out that Mr. Shroyer "contradicted himself" during his deposition. (Doc. 1 at 34). Specifically, at one point in the deposition, Mr. Shroyer said he "had no idea what [Mr. Tucker] and [Mr.] Schuyler hit the victim with," but in the "same depo[sition]," he "named the items that he alleged [Mr.] Tucker] and [Mr.] Schuyler hit the victim with." (*Id.*) Likewise, Mr. Shroyer "first testified in his deposition that the victim had previously attacked him," but "minutes later" he said the victim had "never been aggressive." (*Id.*)

The postconviction court rejected this claim, holding that there was "no legal basis" under Florida law "to impeach [Mr. Shroyer] for contradictions between statements in a deposition that [were] not inconsistent with trial testimony." (Doc. 12-2, Ex. 25, at 9 n.2). This ruling was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney*, 876 F.3d at 1295. Such deference is required here. The postconviction court held that, as a matter of Florida law, Mr. Shroyer could not be impeached with "contradictions between

statements in a deposition that [were] not inconsistent with trial testimony." (Doc. 12-2, Ex. 25, at 9 n.2). Thus, the postconviction court "already has told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Mr. Tucker] argues [she] should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). That determination is binding on federal habeas review. *See Morales v. Sec'y, Dep't of Corr.*, No. 8:21-cv-1846-MSS-TGW, 2024 WL 3540328, at *28 (M.D. Fla. July 25, 2024) ("Whether trial counsel could have impeached Detective Cruz with his deposition testimony about the eyeglasses is an issue of state evidentiary law, and a state court's determination of state law receives deference in federal court.").

Because the postconviction court "authoritatively decided as a matter of [Florida] law" that the proposed impeachment was impermissible, the remainder of the analysis is straightforward. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024). "[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance." *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994). Therefore, the postconviction court reasonably concluded that counsel was not deficient for failing to impeach Mr. Shroyer on this basis.

Third, Mr. Tucker faults counsel for not impeaching Mr. Shroyer with a prior inconsistent statement about the order in which the defendants left the boat. (Doc. 1 at 34). At his deposition, Mr. Shroyer testified that Mr. Tucker and Mr. Schuyler were "still in the wheelhouse" when Mr. Shroyer "walked out." (*Id.*) At trial, however, Mr. Shroyer "testified that the three came out together." (*Id.*) The postconviction court held that "[t]his would have been inadmissible impeachment." (Doc. 12-2, Ex. 25, at 8). It explained that,

under Florida law, an "inconsistency must involve a material, significant fact rather than mere details." (*Id.* at 8-9). According to the court, "[w]ho left when after the assault was complete and the victim had fled was not a material fact, but a detail." (*Id.* at 9). Thus, the inconsistency "would not have been admissible, and counsel would not be deficient for failing to attempt to introduce it." (*Id.*)

This ruling was reasonable. Mr. Tucker's claim "turns on [an issue of] state law"—whether the proposed impeachment was permissible under Florida's evidentiary rules. *Pinkney*, 876 F.3d at 1295. The postconviction court found that the alleged inconsistency "would not have been admissible." (Doc. 12-2, Ex. 25, at 8). That determination is binding here. *See Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure."). Therefore, the postconviction court reasonably concluded that counsel did not provide ineffective assistance by failing to introduce the inconsistency. *See Pink v. Sec'y, Fla. Dep't of Corr.*, No. 21-12640-J, 2022 WL 3138587, at *1 (11th Cir. Mar. 28, 2022) ("[T]his Court must defer to the state post-conviction court's determination that Ramsay's address was a collateral matter that could not serve as a basis for impeachment under Florida's rules of evidence and procedure.").

### 2.    The Jailhouse Informant

As noted above, the informant testified at trial about Mr. Schuyler's confession. According to the informant, Mr. Schuyler said he had "beat[en] holes on the side of the boat in order to sink the boat, to get [the victim] out of the boat." (Doc. 12-2, Ex. 3, at 638). Mr. Tucker contends that counsel should have challenged this testimony with "the State's

own forensic evidence [and] police photos proving there were no holes in the boat." (Doc. 1 at 35). The postconviction court held that Mr. Tucker did not "suffer any prejudice" because the informant "testified only about a statement made by [Mr.] Schuyler that implicated only [Mr.] Schuyler." (Doc. 12-2, Ex. 25, at 9). In other words, "nothing to which [the informant] testified implicated [Mr. Tucker]," and "impeachment would have done nothing to mitigate the effect of the testimony." (*Id.* at 10).

The rejection of this claim was reasonable. As explained above, Mr. Schuyler's confession did not implicate Mr. Tucker, and the jury heard ample independent evidence of Mr. Tucker's guilt. Thus, even if counsel had impugned the informant's credibility, there is no "reasonable probability" that "the outcome at trial would have been different." *Reed*, 767 F.3d at 1261. Regardless, whether Mr. Schuyler kicked holes on the side of the boat is a minor detail. Indeed, the prosecution acknowledged in closing argument that Mr. Schuyler was "[p]robably not" "kicking holes in the boat." (Doc. 12-2, Ex. 3, at 850-51). In these circumstances, a reasonable jurist could conclude that Mr. Tucker suffered no prejudice from the failure to highlight a minor inconsistency between the informant's testimony and the forensic evidence. *See, e.g.*, *Calder v. Dixon*, No. 23-CV-60762, 2023 WL 8719158, at *13 (S.D. Fla. Dec. 18, 2023) (rejecting ineffective-assistance claim because petitioner could not show that counsel's "decision not to impeach [a witness] on this minor inconsistency would've had any effect on the jury's verdict").

### G.    Ground Seven—Failure to Present Evidence of Victim's "Reputation for Violent Behavior"

Mr. Tucker contends that trial counsel was ineffective for failing to present evidence that the victim "had a well-known reputation in the community for exhibiting irrational, psychotic, and aggressive behavior." (Doc. 1 at 36). This evidence allegedly would have bolstered Mr. Tucker's claim of self-defense by showing that the victim's "aggressive behavior during the altercation . . . was not an isolated incident, but . . . a normal character trait." (*Id.*) Mr. Tucker says the victim's violent nature could have come out through Ronald Laskey, Mr. Tucker's "employer." (*Id.* at 38). Mr. Laskey allegedly would have testified "about an incident during an offshore fishing trip where the victim tried to violently harm [Mr. Tucker]." (*Id.*)

The postconviction court held that the "record conclusively refute[d]" this claim. (Doc. 12-2, Ex. 25, at 10). It explained that "counsel deposed" Mr. Laskey before trial. (*Id.*) During that deposition, Mr. Laskey "testified that he took [Mr. Tucker] and the victim on a one-week fishing trip, that they went out together only that one time, and that there was tension between them that he had to step in to resolve." (*Id.*) But "[h]e did not state or even suggest that the victim had attempted to kill [or otherwise harm]" Mr. Tucker. (*Id.*) Moreover, Mr. Laskey "testified that the victim was goofy, but not aggressive," and he "did not state that the victim was irrational or psychotic." (*Id.*) Thus, Mr. Laskey would not have "testified that the victim was violent" or had tried to harm Mr. Tucker. (*Id.*)

This ruling was reasonable. The court accurately summarized Mr. Laskey's deposition testimony. (*Id.*, Ex. 32, at 8-18). Based on that testimony, counsel had no reason

27

to expect that, if called at trial, Mr. Laskey would describe the victim as violent or claim that the victim had "tried to violently harm [Mr. Tucker]" during a fishing trip.[4] (Doc. 1 at 38). Mr. Tucker now contends that counsel should have asked Mr. Laskey about a *different* "offshore fishing trip where the victim tried to violently harm" him. (*Id.*) But counsel asked Mr. Laskey during his deposition whether "this trip that you went on with [Mr. Tucker] and [the victim]" was "the only trip [where] you had the both of them on [the boat]." (Doc. 12-2, Ex. 32, at 10). Mr. Laskey answered, "Yes." (*Id.*) Thus, the record refutes Mr. Tucker's allegation that Mr. Laskey would have testified about a second excursion involving Mr. Tucker and the victim. In these circumstances, a fairminded jurist could conclude that counsel's conduct did not "amount[] to incompetence under prevailing professional norms." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014).

Mr. Tucker separately alleges that counsel should have called three other witnesses to testify to the victim's "reputation . . . for . . . irrational, psychotic, and aggressive behavior." (Doc. 1 at 36). He lists the following potential witnesses: Billy Houghton (an employee of Madeira Beach Seafood), Gary Druid (a commercial fisherman), and David Nichols (Mr. Tucker's co-worker). (Doc. 1 at 37-38). But Mr. Tucker did not name any of these persons in his Rule 3.850 motion. (Doc. 12-2, Ex. 24). "[A] review of a state court adjudication on the merits in light of allegations not presented to the state court—for

---

[4] Moreover, as the postconviction court explained, counsel "elicited testimony" from the detective about the alleged incident on the fishing trip. (Doc. 12-2, Ex. 25, at 10). Specifically, the detective acknowledged that Mr. Tucker "said he was scared of the victim" because "he believed [the victim] had tried to kill him" during an earlier incident on a fishing boat. (*Id.* at 10-11). Thus, as the court found, "the jury was able to consider [this] testimony in its decision-making, so there [was] no reasonable possibility that they would have reached a different result had they heard additional testimony on the same event." (*Id.* at 11).

example, by examining additional facts or claims presented for the first time in a petitioner's federal habeas petition—would insufficiently respect the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts." *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011). Accordingly, this Court "do[es] not consider [Mr. Tucker's] supplemental allegations . . . when reviewing the reasonableness of the state court's resolution of this claim, which was based on the allegations before it." *Powell v. Allen*, 602 F.3d 1263, 1273 n.8 (11th Cir. 2010).

Even if these new allegations were properly before the Court, Mr. Tucker would not be entitled to relief because he cannot show prejudice. The burden of establishing prejudice under *Strickland* "is particularly heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative." *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021). For that reason, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." *Id.* Here, Mr. Tucker presents no evidence—through an affidavit or otherwise—that his proposed witnesses would have testified that the victim had a propensity for violence. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective-assistance claim."). "Without such a showing, [Mr. Tucker] cannot demonstrate *Strickland* prejudice." *Afshar v. Sec'y, Dep't of Corr.*, No. 2:24-cv-826-JES-

NPM, 2025 WL 404629, at *5 (M.D. Fla. Feb. 5, 2025) (finding no prejudice from failure to call witness because petitioner did not "offer[] [the witness's] sworn testimony detailing what he would have said if deposed or called to testify at trial"); *see also Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("[Petitioner] offers only speculation that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner.").

### H.    Ground Eight—Failure to Prepare Mr. Tucker to Testify

Mr. Tucker contends that trial counsel provided ineffective assistance by "not allow[ing] [him] to testify" and failing to "prepare [him] to testify." (Doc. 1 at 41). According to Mr. Tucker, he would have testified that "the assault terminated immediately upon the weapon being removed from the victim." (*Id.*) Mr. Tucker alleges that he "waived his right to testify because counsel told him that she had not prepared questions for" him. (*Id.* at 43). He contends that the absence of his testimony "severely prejudiced" his claim of self-defense, "the only defense viable at trial." (*Id.* at 46).

The postconviction court rejected this claim for lack of prejudice, holding that "even if [Mr. Tucker] had" testified, there was "no reasonable probability that the result of the proceeding would have been different." (Doc. 12-2, Ex. 25, at 11). The court explained that "the jury received, via [cross-examination of the detective, Mr. Tucker's post-*Miranda*] statements that he acted in self-defense and that the victim provoked the fight." (*Id.* at 12). As noted above, Mr. Tucker admitted to the detective that he punched and elbowed the victim and "possibly hit him with a crescent wrench." (*Id.*, Ex. 3, at 483). He claimed, however, that he acted in self-defense, stating that the victim "provoked" the fight by

"pull[ing] [a] knife" and that he "[d]idn't go down there to beat him up." (*Id.* at 498, 505, 517). Mr. Tucker also said that he was "scared" of the victim because he "had tried to kill him" during an earlier incident on a different fishing boat. (*Id.* at 506). As the court explained, Mr. Tucker's statement to the detective suggested "that (1) the victim was the aggressor, (2) [Mr. Tucker] joined the fight to help [Mr.] Shroyer disarm the victim, and (3) [Mr. Tucker] acted in defense of himself and [Mr.] Shroyer." (*Id.*, Ex. 25, at 12). The court found that Mr. Tucker's "proposed testimony would have been mostly cumulative of those statements, and would have opened him up to being cross-examined." (*Id.*) Thus, "because the jury had the substance of [Mr. Tucker's] proposed testimony, yet still found him guilty, there [was] no reasonable probability that the result of the trial would have been different if [he] had testified." (*Id.*)

The postconviction court reasonably found no prejudice. "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002). "[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014) (quoting *Holsey v. Warden*, 694 F.3d 1230, 1260-61 (11th Cir. 2012)). Here, as the postconviction court explained, the jury heard Mr. Tucker's exculpatory version of events through the detective. (Doc. 12-2, Ex. 3, at 498, 505-06, 517). This enabled Mr. Tucker to avoid cross-examination. At best, Mr. Tucker could have

told "a more detailed version of the same story told at trial[,] provide[d] more or better examples[,] or amplifie[d] the themes presented to the jury." *Tanzi*, 772 F.3d at 660. Thus, the postconviction court reasonably concluded that, because such testimony "would have been mostly cumulative," Mr. Tucker failed to establish prejudice. (Doc. 12-2, Ex. 25, at 12).

## I.    Ground Nine—Failure to Object or Move for Mistrial Based on "Inadmissible Testimony"

Mr. Tucker faults trial counsel for failing to object or move for a mistrial when Mr. Shroyer (1) admitted that he and his co-defendants "were all responsible for what, ultimately, happened to [the victim]," and (2) claimed that he lacked "any incentive not to tell the truth today." (Doc. 1 at 47-48). Below is the relevant portion of the transcript:

> Q. Mr. Shroyer, the way you've testified about this whole incident, it seems that [Mr. Tucker] was responsible for a lot of the kicking and the punching and the hitting and the shop vac; is that an accurate—is that what happened?

> A. Yes, sir.

> Q. Would you say that [Mr. Tucker's] role in the physical confrontation maybe was more extensive than Tim Schuyler's role?

> A. Yes, sir.

> Q. But Tim Schuyler was there and he got his licks in, too, right?

> A. Yes, sir.

> Q. And you were there and you were physically involved, too, right?

> A. Yes, sir.

> *Q. You were all responsible for what, ultimately, happened to [the victim]?*

> *A. Yes, sir.*

32

> *Q. Do you have any incentive not to tell the truth today?*
>
> *A. No, sir.*

(Doc. 12-2, Ex. 3, at 595-96 (emphasis added)).

Mr. Tucker contends that the first statement—that all three men were "responsible" for what happened to the victim—constituted impermissible "opinion testimony [on] [Mr. Tucker's] guilt." (Doc. 1 at 48). Thus, counsel was allegedly deficient for failing to object or seek a mistrial. (*Id.* at 47-48). The postconviction court disagreed, finding that Mr. Shroyer "was testifying to events he witnessed firsthand," and that in "context," "the prosecutor was referring to the fact that all three defendants participated in beating the victim, not eliciting [Mr.] Shroyer's opinion that [Mr. Tucker] was guilty of the offense of second-degree murder." (Doc. 12-2, Ex. 25, at 13). Thus, the court held that "the testimony was not objectionable, and not being objectionable, would not have supported a mistrial." (*Id.*)

This ruling "turns on [an issue of] state law"—whether the challenged statement was impermissible opinion testimony under Florida's rules of evidence. *Pinkney*, 876 F.3d at 1295; *see also Bush v. State*, 295 So. 3d 179, 205 (Fla. 2020) ("Statements expressing a witness' opinion as to the credibility, guilt, or innocence of the accused are generally inadmissible."). Therefore, this Court is bound by the postconviction court's determination that the statement was not objectionable. *See Ingram v. Sec'y, Dep't of Corr.*, No. 8:16-cv-2406-SDM-AAS, 2020 WL 5814467, at *10 (M.D. Fla. Sept. 30, 2020) ("Whether the trial court would have overruled an objection is an issue of state law, and a state court's

determination of state law receives deference in a federal court."). Because any objection would have been overruled, the postconviction court reasonably found that counsel "was not deficient." (Doc. 12-2, Ex. 25, at 13).

As for the second statement—that Mr. Shroyer lacked "any incentive not to tell the truth"—Mr. Tucker argues that it constituted improper "bolstering" and violated *Giglio v. United States*, 405 U.S. 150 (1972). (Doc. 1 at 48). According to Mr. Tucker, the statement was improper because the prosecution "was well aware that [Mr.] Shroyer's 20-year sentence was part of a quid pro quo agreement with the State that required [him] to allegedly tell the truth on the stand." (*Id.*) Thus, Mr. Tucker argues that counsel should have objected and moved for a mistrial on this basis. (*Id.*)

The postconviction court correctly concluded that the statement did not violate *Giglio*. (Doc. 12-2, Ex. 25, at 13). "To establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could . . . have affected the judgment." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011). The petitioner "must identify evidence the government *withheld* that would have revealed the falsity of the testimony." *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017) (emphasis added); *see also Ford v. Hall*, 546 F.3d 1326, 1331 (11th Cir. 2008) ("*Giglio* error . . . occurs when the *undisclosed* evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." (emphasis added)).

34

Here, "there was no *Giglio* violation because there was no undisclosed evidence." *Shuler v. Sec'y, Fla. Dep't of Corr.*, 610 F. App'x 856, 858 (11th Cir. 2015). As the postconviction court explained, "[t]he fact that [Mr. Shroyer] received a favorable sentence of 20 years instead of a life sentence was made part of the record by the State, co-defendant's counsel, and [Mr. Tucker's] counsel, and counsel exploited it in closing." (Doc. 12-2, Ex. 25, at 13). Furthermore, "[t]he jury was made well aware of the deal [Mr.] Shroyer struck in exchange for his testimony." (*Id.*) Because Mr. Shroyer's deal was disclosed to the defense, counsel had no basis to raise a *Giglio* claim. *See Rentas v. Fla. Att'y Gen. & Sec'y*, No. 2:15-cv-751-JES-MRM, 2017 WL 11637307, at *5 (M.D. Fla. July 27, 2017) ("Claim One fails at the outset because a *Giglio* analysis presupposes that the evidence at issue was withheld from the defense.").

Moreover, counsel was not deficient for failing to object on grounds of improper "bolstering." (Doc. 1 at 48). "[T]here are many reasons why defense counsel might not object to [an allegedly improper] statement, including [that] the objection may draw attention to the statement." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). Instead of objecting, counsel argued in closing that Mr. Shroyer lacked credibility because he was under "a lot of pressure": "Mr. Shroyer had a bargain. Testify, you get 20 years. I would say the opposite of that is, don't testify, you don't get 20 years. Then you're facing life. Those were his options." (Doc. 12-2, Ex. 3, at 929-30). Counsel argued that this gave Mr. Shroyer an "incentive to lie." (*Id.* at 927). The Court cannot say

that "no competent counsel would have taken the action that [Mr. Tucker's] counsel did take."[5] *Zakrzewski v. McDonough*, 455 F.3d 1254, 1258 (11th Cir. 2006).

### J.    Ground Ten—Failure to Object to Prosecutorial Misconduct

Mr. Tucker faults trial counsel for not objecting to alleged prosecutorial misconduct during closing argument. (Doc. 1 at 51). The postconviction court correctly rejected this claim because "none of the comments were improper, and therefore counsel was not deficient for failing to object and [Mr. Tucker] could have suffered no prejudice thereby." (Doc. 12-2, Ex. 25, at 14-18). "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

First, Mr. Tucker argues that the prosecution impermissibly "comment[ed] on" Mr. Shroyer's "opinion of the evidence" when it said that Mr. Shroyer "doesn't believe it was self-defense." (Doc. 1 at 51). As the postconviction court explained, however, this was "a permissible characterization of [Mr. Shroyer's] testimony." (Doc. 12-2, Ex. 25, at 14). Mr. Shroyer stated that "he was responsible for the victim's death," explaining that he

---

[5] Mr. Tucker appears to fault counsel for not objecting when the prosecution "shift[ed] the burden of proof" by presenting the medical examiner's opinion that the victim "died as a result of complications of blunt trauma." (Doc. 1 at 47; Doc. 12-2, Ex. 3, at 700). This argument is meritless. Nothing in the medical examiner's testimony suggested that Mr. Tucker had "an obligation to produce any evidence or to prove innocence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). Counsel was not deficient for failing to raise this meritless objection.

"disarmed the victim, stopped beating him for a short amount of time, and then resumed the assault with [Mr. Tucker]." (*Id.*) Furthermore, he "pleaded guilty to murder in the second degree, forgoing the right to argue that he acted in self-defense." (*Id.*) As the court found, the prosecution simply urged the jury to draw a reasonable inference from the evidence—namely, that Mr. Shroyer did not "believe it was self-defense." (Doc. 12-2, Ex. 3, at 828). "A prosecutor is not limited to a bare recitation of the facts, but instead, may comment on the evidence and express the conclusions he contends the jury should draw from the evidence." *Crenshaw v. Sec'y, Fla. Dep't of Corr.*, No. 16-17735-D, 2017 WL 6761058, at *6 (11th Cir. Oct. 18, 2017); *see also United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014) ("The purpose of closing argument is to assist the jury in analyzing the evidence, and although a prosecutor may not exceed the evidence presented at trial during her closing argument, she may state conclusions drawn from the trial evidence.").

Second, Mr. Tucker contends that the prosecution committed misconduct by saying, "[I]t's probably not self-defense." (Doc. 1 at 51). The postconviction court correctly found that this comment was "permissible." (Doc. 12-2, Ex. 25, at 14). It noted that "[t]he prosecutor made this comment after summarizing all of the evidence introduced other than [Mr.] Shroyer's testimony and the statements of [Mr. Tucker] and [Mr.] Schuyler." (*Id.*) As the court explained, "one of the issues in the trial was whether [Mr. Tucker] had a justification for his use of force." (*Id.*) Thus, "it was permissible for the prosecutor to argue that he did not." (*Id.*) Indeed, a prosecutor is not limited to "flat, robotic recitations of 'just the facts.'" *Diaz v. State*, 797 So. 2d 1286, 1287 (Fla. 4th DCA 2001). To the contrary,

closing argument "is a time for robust [and] vigorous challenging . . . of an opponent's
ideas." *Id.*

Third, Mr. Tucker contends that the prosecution "fabricated" evidence by stating
that he hit the victim "ten times with a shop vac." (Doc. 1 at 51-52). As the postconviction
court explained, however, Mr. Shroyer testified that Mr. Tucker "grabbed the . . . shop vac"
and "slammed it on top of [the victim's] head about ten times." (Doc. 12-2, Ex. 3, at 555).
Because the evidence supported the prosecution's statement, counsel had no basis to object.
*See Silvia v. State*, 60 So. 3d 959, 977 (Fla. 2011) ("The proper exercise of closing
argument is to review the evidence and to explicate those inferences which may reasonably
be drawn from the evidence.").

Fourth, Mr. Tucker argues that the prosecution "made numerous comments on [his]
right to [remain] silen[t]." (Doc. 1 at 52). All but one of the remarks related to Mr. Tucker's
post-*Miranda* interview with law enforcement. (Doc. 12-2, Ex. 3, at 838-39, 849, 958,
964). Specifically, the prosecution opined that Mr. Tucker did not give a "clear picture of
what happened" during his interview, offering only "vague" and "self-serving statements."
(*Id.* at 839). Likewise, the prosecution argued that Mr. Tucker "left out a lot" in his
statement to the police. (*Id.* at 849). As the postconviction court explained, these remarks
did not infringe on Mr. Tucker's right to remain silent because they "involved statements
that [he] made to [the detective] after being advised of his *Miranda* rights." (Doc. 12-2,
Ex. 25, at 15). In other words, because Mr. Tucker "did not exercise his right to remain
silent [during the interview], the prosecutor could hardly have commented impermissibly
on his silence." *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir. 1991); *see also Wray v.*

*State*, 639 So. 2d 621, 624 (Fla. 4th DCA 1994) ("It is clear that the prosecutor's comment was only referring to facts the defendant omitted when the defendant gave his statement. Since the defendant was read his *Miranda* rights, he waived his right to remain silent as to his statement. The prosecutor's comment could not, therefore, have infringed on that right.").

Mr. Tucker points to another remark that allegedly infringed on his right to remain silent. (Doc. 1 at 52). The prosecution pointed out that after the beating, Mr. Tucker did not tell Mr. Zaleski—the owner of the boat—that he "acted in self-defense" or was "scared for [his] life." (Doc. 12-2, Ex. 3 at 838). This remark was not improper. "While the prosecutor may not impermissibly comment upon a defendant's right to remain silent, this protection does not extend to statements that the defendant makes to private citizens [such as Mr. Zaleski]." *Johnson v. Burt*, No. 20-1760, 2020 WL 6588631, at *2 (6th Cir. Nov. 9, 2020) (citation omitted); *see also State v. Neeper*, 999 A.2d 251, 255 (N.H. 2010) ("[T]he defendant's silence towards private parties is not constitutionally protected.").

Fifth, Mr. Tucker contends that the prosecution improperly stated that he "advised the 911 operator that the incident he called about was not an emergency." (Doc. 1 at 52). As noted above, hours before the beating, the victim allegedly swung at Mr. Schuyler with a knife. (Doc. 12-2, Ex. 3, at 534). Mr. Tucker called 911 to report the incident, but he told the operator it was "not an emergency" and "left before [the police] showed up." (*Id.* at 495). Mr. Tucker contends that he "never" said the incident was not an emergency. (Doc. 1 at 52). As the postconviction court explained, "the 911 call was not entered into evidence." (Doc. 12-2, Ex. 25, at 15). Instead, the contents of the call were admitted

through the detective, who testified that Mr. Tucker "said 'it was not an emergency.'" (*Id.*) Because the evidence supported the prosecution's remark, counsel had no basis to object. *See Silvia*, 60 So. 3d at 977 ("The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.").

Sixth, Mr. Tucker faults the prosecution for saying that the victim "tried to call 911" during the beating. (Doc. 1 at 52). As the postconviction court found, however, this comment "was a permissible inference" from the evidence. (Doc. 12-2, Ex. 25, at 16). Mr. Shroyer testified that, during a lull in the beating, the victim "got up and got his cell phone out and tried to dial somebody's number." (*Id.*, Ex. 3, at 552). A reasonable inference from this testimony is that the victim was trying to call the police. "[P]roper closing arguments review the evidence and explain the reasonable inferences that could be drawn from it." *Chance v. Sec'y, Fla. Dep't of Corr.*, No. 22-14103, 2024 WL 21375, at *2 (11th Cir. Jan. 2, 2024).

Seventh, Mr. Tucker contends that the prosecution impermissibly stated that Mr. Shroyer "took responsibility" for his actions. (Doc. 1 at 53; Doc. 12-2, Ex. 3, at 844). Specifically, the prosecution said, "[Mr. Shroyer] could have come in here and alleged self-defense or whatever else he wanted to do. But, no. He took responsibility. [The victim] was his friend." (Doc. 12-2, Ex. 3, at 844). The postconviction court correctly found that this comment was proper. (*Id.*, Ex. 25, at 16). As it explained, the remark was "supported by the evidence" because Mr. Shroyer "testified that he was responsible for the victim's death,

and pleaded guilty to his murder." (*Id.*) Thus, the prosecution properly "state[d] [a] conclusion[] drawn from the trial evidence." *Reeves*, 742 F.3d at 505.

Eighth, Mr. Tucker maintains that the prosecution misstated the evidence when it said that he and his co-defendants tried "to avoid the police" after the beating. (Doc. 1 at 53). But as the postconviction court pointed out, this "was a permissible inference based on the evidence." (Doc. 12-2, Ex. 25, at 16). In support, the court noted that (1) "[n]one of the defendants turned themselves in," (2) Mr. Shroyer "changed his haircut to avoid being found by the police," (3) Mr. Schuyler was (according to the jailhouse informant) "trying to lay low" and "trying to avoid [the] police" after the beating, (4) Mr. Tucker told the detective that "he really didn't want to be there speaking" with the police, and (5) neither Mr. Schuyler nor Mr. Tucker "called 911 to report being attacked and having to use force in self-defense, as they claimed in their interviews." (*Id.*) Given this evidence, the prosecution did not overstep by arguing that Mr. Tucker and his co-defendants tried to avoid the police. *See Silvia*, 60 So. 3d at 977 ("The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.").

Ninth, Mr. Tucker argues that the prosecution improperly "bolster[ed]" Mr. Shroyer's credibility by saying that he "ha[d] to testify truthfully" because if he did not, "his 20 years [would be] jeopardized." (Doc. 1 at 53; Doc. 12-2, Ex. 3, at 960-61). The postconviction court correctly held that this did not constitute improper bolstering. (Doc. 12-2, Ex. 25, at 17). "A prosecutor's remarks are improper if they attempt to bolster the credibility of a witness based on the government's reputation or through alluding to

evidence not admitted at trial." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). "To determine if the government improperly vouched for a witness, the court must decide whether a jury could reasonably believe that the prosecutor was indicating a personal belief in the witness'[s] credibility." *Id.* "This prohibition against vouching does not, however, forbid prosecutors from arguing credibility; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." *Id.*

Here, the challenged remark did not "amount to an explicit, personal guarantee of credibility, such as assuring the jury that the prosecution would not have brought the case unless the defendant was actually guilty." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). Instead, as the postconviction court explained, the statement rested on "the evidence admitted" at trial. *United States v. Hope*, 608 F. App'x 831, 841 (11th Cir. 2015). Specifically, Mr. Shroyer stated that he "received 20 years in exchange for *testifying truthfully* about what happened." (Doc. 12-2, Ex. 3, at 568 (emphasis added)). The prosecution could rely on this statement to argue that Mr. Shroyer "ha[d] to testify truthfully" because if he did not, "his 20 years [would be] jeopardized." (*Id.* at 960-61). "[A]n attorney is allowed to argue . . . credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." *Miller v. State*, 926 So. 2d 1243, 1254-55 (Fla. 2006); *see also United States v. Tucker*, 402 F. App'x 499, 503 (11th Cir. 2010) ("[T]he prosecutor neither places the prestige of the government behind the witness nor implicitly vouches for the witness's credibility by questioning the witness about the terms of his plea agreement requiring him to testify truthfully and completely.").

Finally, Mr. Tucker faults the prosecution for arguing that he called 911 before the beating "in an attempt to cover for what was planned for later that night." (Doc. 1 at 54). As Respondent correctly points out, this allegation is unexhausted because Mr. Tucker did not raise it in his Rule 3.850 motion. (Doc. 12-2, Ex. 24, at 39-41). "[T]he prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004). This means that "petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts." *Id.* Therefore, this "particular factual instance[] of ineffective assistance" is unexhausted and procedurally defaulted. *Id.* And because Mr. Tucker offers no basis to excuse the default, the allegation is barred from federal habeas review.[6]

### K.    Ground Eleven—Cumulative Error

Mr. Tucker argues that the "cumulative effect of all errors denied [him] his right to a fair trial." (Doc. 1 at 56). "Under the cumulative error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares*, 755 F.3d at 1284. A cumulative error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because each individual claim of error lacks merit, Mr. Tucker cannot establish cumulative error.

---

[6] Even if this allegation were exhausted, Mr. Tucker cannot "establish a reasonable probability that, but for counsel's [failure to object], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261.

## IV.    Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. Tucker's petition (Doc. 1) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Tucker and to **CLOSE** this case.

3. Mr. Tucker is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Tucker must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Tucker has not made the requisite showing. Because Mr. Tucker is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on May 2, 2025.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE